UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 11-38-KSF

THE ESTATE OF RANDY STEVEN PRIDEMORE, *et al.*　　　　　　　　　　PLAINTIFFS

v.　　　　　　　　　　**OPINION & ORDER**

BLUEGRASS REGIONAL MENTAL HEALTH-
MENTAL RETARDATION BOARD, *et al.*　　　　　　　　　　DEFENDANTS

\* \* \* \* \* \* \* \* \* \*

Currently before the Court are the motions [DE #78 and 96] of the defendants, Peter Taylor ("Taylor") and Bluegrass Regional Mental Health-Mental Retardation Board, Inc. ("Bluegrass"), for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. These motions are fully briefed and are ripe for review. Also before the Court is the motion [DE # 100] of the Plaintiffs, the Estate of Randy Steven Pridemore, *et al*, for oral argument on the motions for summary judgment, which will be denied.

**I.　　FACTUAL AND PROCEDURAL BACKGROUND**

This action arises from the suicide of the Plaintiff's decedent, Randy Steven Pridemore, on September 19, 2010. The events leading up to his suicide are largely undisputed. They began on September 18, 2010 when police officers were called to his residence to address an allegation that he had threatened his wife and minor son. When the officers arrived, Pridemore was found to be intoxicated and the officers noted the presence of several weapons at the scene. Pridemore's wife informed Officer Jamie Johnson that her husband had stated that "I'd rather be dead than in jail" or

1

"if I go to jail I will die." However, Officer Johnson did not personally hear any threats of self-harm from Pridemore. Pridemore was ultimately transported by Officer Johnson to the Fayette County Detention Center ("Detention Center") where he arrived at 4:05 p.m.

Once Pridemore arrived at the Detention Center, he was screened for risk by the intake staff. Based on the results of this screening, the defendant, Peter Taylor, a licensed clinical social worker, was called upon to assess Pridemore's suicide risk. Taylor was an employee of the defendant, Bluegrass. Bluegrass has been providing on-site mental health risk care at the Detention Center since the mid-1980's pursuant to a contract between the Lexington Fayette Urban County Government and Bluegrass. The adequacy of Taylor's assessments is the subject of this case. However, it is undisputed that Taylor assessed Pridemore on two separate occasions. The first occurred shortly after Pridemore's arrival at the Detention Center and lasted just over three and one half minutes. Taylor's written reports of this assessment reflects that a second-hand statement of self-harm was related by Mrs. Pridemore to the arresting officer [DE #78-9]. Taylor noted that Pridemore was extremely intoxicated but "calm and able to converse rationally and address concerns about his potential for harm to himself or others." Taylor also noted that Pridemore denied any statements of self-harm, claiming that his wife had lied about the statements and that she was bipolar. Based on this assessment, Pridemore was cleared for the general population, but Taylor did note that he was to be held separate from the general population and that he intended to bond out early.

Taylor reevaluated Pridemore just prior to his release. This assessment also lasted approximately three minutes. According to Taylor's written report, Pridemore continued to deny that he was contemplating violence to himself or others and denied any mental health or safety issues.

Pridemore informed Taylor that he intended to go to a hotel and stay away from his wife. Taylor noted that Pridemore was more sober than on the first encounter [DE #78-9].

Pridemore was released from the Detention Center at 5:43 p.m. on September 18, 2010. His total stay at the Detention Center was only one hour and thirty-eight minutes. He left in a taxi and went to the Lexington Motor Inn on Winchester Street. There, he was served by officers with an EPO that had been taken out by his wife earlier that day. At approximately 2:00 a.m. on September 19, 2010, Pridemore phoned his wife and told her "tell the dogs that I love them. That I love [his minor son]," then hung up. Although her husband sounded intoxicated, Pridemore's wife did not contact any mental health provider, police, or 911 as a result of this phone call.

The next morning, September 19, 2010, an employee of the Lexington Motor Inn attempted to check on Pridemore sometime after 11:00 a.m. When he received no response, 911 was called. Emergency responders arrived and found Pridemore dead, apparently having hung himself with a string from his shorts. The police report notes that a receipt in the room indicated that Pridemore had purchased two bottles of alcohol at approximately 6:00p.m the night before and further states that motel staff reported seeing Pridemore returning from the "Platinum Plus" adult entertainment club at about 11:00 p.m. on September 18, 2010. According to the Coroner's Report, the time of death was about 2:25 a.m. on September 19, 2010.

This suit arises out of the Plaintiff's claim that Pridemore's civil rights were violated based on the failure to seek involuntary commitment of Pridemore due to the imminent danger he presented to himself while at the Detention Center. Initially, on January 25, 2011, the Plaintiffs brought suit against the Lexington Fayette Urban County Government and several officers and employees of the County [DE #1, 4]. On September 15, 2011, the Plaintiffs filed a second suit naming Taylor,

3

Bluegrass, and Lieutenant Tina Strange as defendants.  *See* Lexington Civil Action No. 11-297 [DE #1].  These cases were ultimately consolidated into this case, and the claims against the Lexington Fayette Urban County Government, its officials, and employees were voluntarily dismissed on September 16, 2011 [DE #42].  This action remains pending against Taylor and Bluegrass on the following claims: (1) violations of Pridemore's civil rights pursuant to 42 U.S.C. § 1983; (2) negligence; (3) failure to train or supervise pursuant to 42 U.S.C. § 1983; (4) breach of contract; and (5) breach of Kentucky's detainment procedure mandated by KRS 202A pursuant to KRS 446.070.

On August 18, 2012, Taylor and Bluegrass filed their motion for summary judgment [DE # 78].  They first argue that the Plaintiffs cannot establish their 42 U.S.C. § 1983 civil rights claim because Pridemore's injury did not occur while he was in custody.  Second, Taylor and Bluegrass argue that the plaintiffs' 42 U.S.C. § 9183 claims against Taylor must be dismissed as barred by qualified official immunity.  Finally, Taylor and Bluegrass argue that the Plaintiffs' state law claims must be dismissed based on qualified official immunity.

## II.     SUMMARY JUDGMENT STANDARD

Rule 56(a) entitles a moving party to summary judgment if that party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(c)(1) further instructs that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion" by citing to the record or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The "moving party bears the burden of showing the absence of any genuine issues of material fact." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). The moving party may meet this burden by demonstrating the absence of evidence concerning an essential element of the nonmovant's claim on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, it must produce specific facts showing that a genuine issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). If, after reviewing the record in its entirety, a rational fact finder could not find for the nonmoving party, summary judgment should be granted. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

**III.  ANALYSIS**

    **A.  QUALIFIED IMMUNITY**

The Court turns first to the Defendants' argument that the § 1983 claims against Taylor must be dismissed as barred by qualified immunity. Generally, a government official performing discretionary functions is entitled to qualified immunity in his individual capacity, and is, therefore, shielded from liability for civil damages, if his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Harlow v. Fitzgerald*,

5

457 U.S. 800, 818 (1982); *Barber v. City of Salem, Ohio*, 953 F.2d 232, 236 (6th Cir. 1992). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815 (2009). Such immunity is "'an expression of policy designed to aid in the effective functioning of government.'" *Scheuer v. Rhodes*, 416 U.S. 232, 242 (1974)(quoting *Barr v. Matteo*, 360 U.S. 564, 572-73 (1959)). The protection provided by qualified immunity covers mere mistakes in judgment and applies "regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 129 S.Ct. at 815 (*quoting Groh v. Ramirez*, 540 U.S. 551, 567 (2004)(Kennedy, J., dissenting)).

The Plaintiffs argue that Taylor is not eligible for qualified immunity based on the Sixth Circuit's recent decision in *McCullum v. Tepe*, 693 F.3d 696 (6th Cir. 2012). The plaintiff in *McCullum* brought a civil rights action against, *inter alia*, Dr. Kenneth Tepe, a physician employed by a non-profit entity that provided counseling, mental-health screening and mental-health assessments for inmates at the county prison after her son committed suicide at the prison. The plaintiff claimed that Dr. Tepe was deliberately indifferent to her son's serious medical disease. Dr. Tepe asserted the defense of qualified immunity.

While the Sixth Circuit noted that the Supreme Court had made clear that "[a] physician who contracts to provide medical services to prison inmates . . . acts under color of state law for purposes of § 1983," . . . "a party is not entitled to assert qualified immunity simply because he is amenable to suit under § 1983." *Id*. at 700. Section 1983 affords no immunities itself. However, the Supreme Court has "accorded certain government officials either absolute or qualified immunity from suit if

6

the tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that Congress would have specifically so provided had it wished to abolish the doctrine." *Wyatt v. Cole*, 504 U.S. 158, 163-64 (1992)(internal quotations omitted).

When determining whether a private party is eligible for qualified immunity from a § 1983 suit, the Supreme Court has outlined a two-part test. First, the court must determine whether there was a firmly rooted history of immunity for similarly situated parties at common law. If the first test is satisfied, then the court must determine whether granting immunity would be consistent with the history and purpose of § 1983. *See Filarsky v. Delia*, 132 S.Ct. 1657, 1662 (2012); *Richardson v. McKnight*, 521 U.S. 399, 404 (1997).

Applying these principals, and reviewing common law immunities, the Sixth Circuit first concluded that there was no firmly rooted tradition of immunity at common law for a private physician working for a state institution. *McCullum*, 693 F.3d at 704. The Sixth Circuit then considered three of the goals of § 1983: (1) "protecting the public from unwarranted timidity on the part of public officials;" (2) "ensur[ing] that talented candidates were not deterred by the threat of damages suits from entering public service; *Richardson*, 521 U.S. at 408; and (3) guarding against the distraction from job duties that lawsuits inevitably create. *Id.* at 411. The Court concluded that granting immunity to the private physician would not be consistent with the history and purpose of § 1983. Accordingly, the *McCullum* Court concluded that Dr. Tepe was not entitled to assert qualified immunity.

The facts of *McCullum* are strikingly similar to this case. Here, Taylor, while not a physician, is a licensed clinical social worker. He is employed by Bluegrass, a private corporation and independent contractor doing business with the Detention Center pursuant to a contract between the

7

parties. The Plaintiffs have failed to show any firmly rooted tradition of granting immunity to private parties like Taylor, nor does the history and purpose of § 1983 justify extending such immunity. Accordingly, Taylor is not entitled to assert the defense of qualified immunity.

### B. CONSTITUTIONAL CLAIMS

#### 1. SUBSTANTIVE DUE PROCESS CLAIMS

The Court first turns to the Plaintiff's claims under § 1983 that the defendants violated Pridemore's substantive due process rights. Section 1983 provides a remedy against "any person" who, acting under color of state law, deprives another person of rights protected by the Constitution. 42 U.S.C. § 1983. The initial inquiry in any section 1983 action must focus on whether the alleged conduct resulted in the deprivation of rights, privileges or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981). "Unless a deprivation of some federal constitutional or statutory right has occurred, Section 1983 provides no redress even if the plaintiff's common law rights have been violated and even if the remedies available under state law are inadequate." *Lewellen v. Metropolitan Government of Nashville and Davidson County, Tennessee*, 34 F.3d 345, 347 (6th Cir. 1994).

Here, the constitutional violation asserted by the Plaintiffs is the deprivation of Pridemore's life without due process of law. Because Pridemore was not in custody at the time of his death, and because he was only a pretrial detainee while he was detained, he was not entitled to protection under the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520 (1979). Rather, the Plaintiffs can only proceed on the basis of an alleged violation of Pridemore's Fourteenth Amendment due process rights. Accordingly, this Court must view the facts of this action against the standards applicable

8

to substantive due process claims to determine if the conduct in question rises to the level of a constitutional violation.

The standards by which governmental conduct must be measured to determine if a violation of substantive due process has occurred were first set out in *Rochin v. California*, 342 U.S. 165 (1952), where the Supreme Court held that conduct that "shocks the conscience" violated substantive due process under the Fourteenth Amendment. *Rochin*, however, provided no guidelines as to the type of conduct that would be deemed to be a constitutional violation. The Supreme Court later clarified that negligent conduct is not a violation of substantive due process in the companion cases of *Daniels v. Williams*, 474 U.S. 327 (1986) and *Davidson v. Cannon*, 474 U.S. 344 (1986). In these cases, the Supreme Court held that the Fourteenth Amendment protects only against "affirmative abuse of power." *Daniels*, 474 U.S. at 331. Later, in *Collins v. City of Harker Heights, Texas*, 503 U.S. 115 (1992), the Supreme Court explained:

> ...Because the Due Process Clause 'does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society,' *Daniels v. Williams*, 474 U.S. at 332, 106 S.Ct. at 665, we have previously rejected claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law (citations omitted).

*Id* at 128.

Reacting to the Supreme Court's decision in *Collins*, the Sixth Circuit in *Lewellen* held that "gross negligence is not actionable under Section 1983, because it is 'not arbitrary in a constitutional sense.'" *Lewellen*, 34 F.3d at 351, citing *Collins*, 503 U.S. at 129. Thus, to establish a claim under Section 1983 for a substantive due process violation, the plaintiff must show conduct that is more egregious than "gross negligence," in other words, conduct that "shocks the conscience."

Here, the Plaintiffs claim that the assessments performed by Taylor violated Pridemore's due process rights. However, Pridemore's death did not occur until approximately nine (9) hours after he had been released. The Due Process Clause does not impose an affirmative obligation on state actors to ensure that an individual's interest in life, liberty or property is not deprived other than by the state itself. *DeShaney v. Winnebago County*, 489 U.S. 189 (1989).

In *DeShaney*, the petitioner, the mother of a child who had been severely beaten by his father, brought a civil rights action against various social workers and local police who failed to remove the child from his father's custody after receiving complaints that the father was abusing the boy. There was no dispute that the Winnebago County Social Services Agency was aware of the abuse, and at one point even took emergency protective custody of the child. However, the child was ultimately returned to his father. While in his father's care, he suffered beatings so severe they resulted in permanent brain damage. In rejecting the petitioner's claim, the Supreme Court held that the state does not become "the permanent guarantor" of a person's safety merely because the individual had once been in custody of the state. *Id*. at 201. This is true even when the state or its agents had a specific awareness of the danger and even expressed a willingness to provide assistance. *Id*. at 198. The Supreme Court did recognize as a general proposition that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being." *Id*. at 199-200. However, this duty only applies while the individual is in custody. As explained by the Supreme Court:

> In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf - through incarceration, institutionalization, or other similar restraint of personal liberty - which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

10

*Id*. at 200.

The facts and law of *DeShaney* are directly applicable to this action. The child in *DeShaney* was in protective custody and an assessment was made that it was safe to return the child to his father just as Pridemore was in custody and an assessment was made that he was safe to be released. The Supreme Court rejected the plaintiff's claim in *DeShaney* because the injury - the beating by his father - was inflicted upon the child once he was released from protective custody. The injury to Pridemore - his suicide nine hours after his release - was also inflicted after he was released.

There are two exceptions to *DeShaney*'s general rule that there is no constitutional liability for injuries that occur outside of state custody: the state-created danger exception, and the special relationship exception. For the reasons set forth below, neither exception applies in this case.

The state-created danger exception applies where there is affirmative conduct on the part of the state in placing the plaintiff in danger. *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1988). For example, a state created danger exception has been found where a police officer ejected a woman from a vehicle in a high-crime area where she was subsequently raped, *Wood v. Ostrander*, 879 F.2d 583 (1989); where police officers detained an intoxicated woman one third of a block from her home on a cold night and then released her to walk home alone after sending her husband home, and the plaintiff suffered hypothermia, *Kneipp v. Tedder*, 95 F.3d 1199 (3rd Cir. 1996); where officer ejected a drunk patron from a bar on a freezing Montana night where he died of hypothermia, *Munger v. City of Glasgow Police Department*, 227 F.3d 1082, 1087 (9th Cir. 2000); and where an inmate specifically advised jail staff that he was bipolar and needed medication, was never provided with a medical assessment and was released miles from his home, without money, shoes, phone or means of transportation, *Lum v. County of San Joaquin*, 2012 WL 1027667 (E.D. Cal. March 23,

2012). In these cases, the courts found that the plaintiff was in worse condition after the officers intervened, and that the state acted with deliberate indifference to a known or obvious danger.

In the present case, the Plaintiffs make no allegation that the Defendants created any additional or increased risk to Pridemore's condition due to his incarceration. Pridemore was obviously less intoxicated when he left the Detention Center than when he arrived. Thus, any claim that the state-created danger exception applies must be rejected.

The special relationship exception is implicated when a state takes a person into its custody and holds him against his will. *Jones v. Reynolds*, 438 F.3d 685, 689 (6th Cir. 2006). Certainly, Pridemore's brief incarceration created a special relationship whereby the Detention Center and its employees were responsible for his health and safety. The Plaintiffs claim that while Pridemore was incarcerated, the defendants were deliberately indifferent to his serious medical needs.

While the Eighth Amendment does not apply to the Plaintiffs' claims in this case since Pridemore was only a pretrial detainee, the Sixth Circuit has made clear that such detainees are entitled to the same Eighth Amendment rights as other inmates. *Roberts v. City of Troy*, 773 F.2d 720, 723 (6th Cir. 1985). It is well settled that prisoners have a constitutional right to medical care. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). This constitutional right is violated when prison doctors or officials are deliberately indifferent to the prisoner's serious medical needs. *Id*. at 104. The Supreme Court has likened "deliberate indifference" to criminal recklessness, requiring a subjective showing that a defendant was aware of the risk of harm. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

Although not binding, this Court finds the decision by the First Circuit Court of Appeals in *Coscia v. Town of Pembroke, Massachusettes*, 659 F.3d 37 (1st Cir. 2011), to be persuasive. In

*Coscia*, the decedent made repeated threats that he would kill himself both during his arrest and while he was incarcerated for seven hours. During his incarceration, he was never seen by any healthcare provider and was released. Approximately fourteen hours after his release, the decedent committed suicide. In granting summary judgment, the First Circuit held "there is no due process liability for harm suffered by a prior detainee after release from custody in circumstances that do not effectively extend any state impediment to exercising self-help or to receiving whatever aid by others may normally be available." *Id*. at 41.

In this case, the record reveals that Pridemore never made any threat of self-harm to any of the officers during his arrest, or to anyone at the Detention Center during his incarceration. Rather, the record reveals only one second-hand statement made by Pridemore's wife during his arrest that she had heard her husband threaten to kill himself. While Pridemore was not entirely cooperative and/or responsive during Taylor's assessments of his condition during his detention, a review of these assessments does not reveal any obvious likelihood of self harm.

Moreover, to the extent that the Plaintiffs claim that the Defendants failed to restrain Pridemore, against his will, as an imminent danger to himself pursuant to KRS 202A.041, there is simply no evidence in the record to justify such a detention. Under the statute, a peace officer can detain an individual whom he believes to be mentally ill and to present a danger to himself or others. KRS 202A.041. Under Detention Center Policy, an emergency detention under this statute is only authorized if the Detention Center staff witnesses an allegation of self-harm or harm to others [DE #78-10]. The Plaintiffs make no allegation that Pridemore made any threats of self-harm or harm to others. The record reveals that he gave a plausible explanation for his wife's alleged statements and that he denied any future intention to commit suicide or be otherwise violent.

13

In support of their claims, the Plaintiffs rely on the testimony of their expert witness, Dr. Ronald Maris, who claims that Taylor's assessments fell below the standard of care [DE # 78-15]. However, even if Taylor's assessments were somehow negligent, this negligence is not sufficient to maintain their constitutional claim. The fact remains that the Plaintiffs have failed to show conduct on the part of the Defendants that "shocks the conscience" or to establish a claim for deliberate indifference as a matter of law against either Taylor or Bluegrass. Accordingly, the Defendants' motion for summary judgment on the Plaintiffs' § 1983 claims for substantive due process and Eighth Amendment violations will be granted.

### 2. FAILURE TO TRAIN

The Plaintiffs also make a claim against Bluegrass for failure to train or supervise under § 1983, alleging that Bluegrass was deliberately indifferent to the known need to adequately train Taylor in connection with his obligation to evaluate, treat or refer offenders, like Pridemore, for suicide risk, and that these inadequacies resulted in Pridemore's death. At the Court's request, the parties have separately briefed this issue [DE #93, 96, 98, 99].

To establish a cause of action for deliberate indifference for failure to train, the plaintiff must show (1) that training or supervision was inadequate to the tasks performed; (2) that the inadequacy was the result of the defendant's deliberate indifference and; (3) that the inadequate training was the "prime moving force" causing the injury. *Ellis v. Cleveland Municipal School District*, 455 F.3d 690 (6th Cir. 2006). This same standard applies to failure to train claims against a private entity allegedly acting under color of state law, such as Bluegrass in the present action. *Street v. Corrections Corporation of America*, 102 F.3d 810, 818 (6th Cir. 1996).

14

Thus, the Court must first determine whether the Plaintiffs have shown that Taylor's training was inadequate to the tasks performed. The Plaintiffs cannot succeed simply by showing that "better" training could have prevented the alleged injury. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390-91 (1989). Moreover, the fact that an employee may have been inadequately trained cannot "alone suffice to fasten liability" on an entity, as the employee may have shortcomings resulting from other factors. *Id*. As the Supreme Court stated, adequately trained staff "occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding" an entity liable. *Id*.

Here, the anticipated task consists of performing the risk assessment. *Ellis*, 455 F.3d at 700-01. The record reveals that Taylor received adequate education, training, and experience to perform this task. When Taylor was hired by Bluegrass in 1989 as a Mental Health Specialist, he was trained and supervised by Judy Rhodus, the Director of the Bluegrass program. Since that time, Taylor has provided on-site mental health assistance at the Detention Center. Rhodus has stated that she not only provided Taylor with training on risk assessment at the Detention Center, but also observed the quality and competence of his evaluations during her tenure as Director which concluded in 2004 [DE #96-4, Affidavit of Judy Rhodus]. Taylor's annual competency reviews were consistently high and attest to his knowledge and competency.

In 1995, Taylor became a Certified Clinical Social Worker. Then, in 2005, he obtained his Master's degree and passed his certification examination to be a Licensed Certified Social Worker [DE #96-3, Deposition of Peter Taylor, p. 13]. This certification required two hundred hours of supervision by another Licensed Clinical Social Worker ("LCSW"), which he completed at the

15

Detention Center, as well as passing the appropriate examination to become a LCSW. At the time Taylor performed the risk assessments of Pridemore at issue in this case, he was a LCSW.

Additionally, Bluegrass had policies for training and supervision in place for those employees making assessments of risk in the inmate population in order to ensure inmate safety. In particular, Bluegrass' Mental Health Training Manual, on which every employee is trained, contains both general and specific information concerning suicide risks in jails and sets out the levels of inmate safety precautions and instructions for those actions [DE # 96-9]. Taylor has testified that he participated in training of new employees, including training new employees in the performance of risk assessments [DE #96-3, Taylor Deposition, DE # 96-3, Rhodus Affidavit]

The Plaintiffs contend that Taylor's training was inadequate because he was not trained consistent with KRS 210.365. While it is true that the contract between Bluegrass and LFUCG requires Bluegrass to establish a triage system that meets the "intent of KRS 210.365, Telephonic Behavioral Triage System," the Plaintiffs attempt to apply portions of the statute imposing formal training and curriculum requirements on law enforcement officers, KRS 210.365(1) - (11), to those screening inmates at the jail. There is simply no support for this proposition. Rather, the Telephonic Behavioral Triage System, referred to in the contract, is set out in subsections (12)-(17) of KRS 210.365. These subsections contain no requirement for training curricula. Relevant to this matter is KRS 210.365(12) which states as follows:

> The Cabinet for Health and Family Services shall create a telephonic behavioral health jail triage system to screen prisoners for mental health risk issues, including suicide risk. The triage system shall be designed to give the facility receiving and housing the prisoner an assessment of his or her mental health risk, with the assessment corresponding to recommended protocols for housing, supervision, and care which are designed to mitigate the mental health risks identified by the system. The triage system shall consist of:

16

>   (a)   A screening instrument which the personnel of a facility receiving a prisoner shall utilize to assess inmates for mental health, suicide, intellectual disabilities, and acquired brain injury risk factors; and
>   (b)   A continuously available toll-free telephonic triage hotline staffed by a qualified mental health professional which the screening personnel may utilize if the screening instrument indicates an increased risk for mental health risk for the assessed prisoner

KRS 210.365(12).

The Detention Center implements this statute by first requiring staff - "the personnel of a facility" - at the Detention Center to complete an "Intake Questionnaire" - the required "screening instrument." Then, pursuant to the contract, a Bluegrass "qualified mental health professional" is available to address any possible risk revealed by the screening instrument. A qualified mental health professional, as used in KRS 210.365, and defined in KRS 202A.011, includes a licensed clinical social worker with three (3) years of inpatient or outpatient clinical experience in psychiatric social work and currently employed by a regional community program for mental health. Taylor certainly satisfies this statutory requirement.

Thus, based on Taylor's education, experience and training as a licensed clinical social worker with over twenty years experience in assessing inmates for suicidal risk, the Plaintiffs have failed to establish that the training he received from Bluegrass was inadequate. Bluegrass fully complied with both its statutory and contractual requirements in providing training to Taylor. For these reasons, the Court cannot find that the plaintiff has established that Taylor was inadequately trained to perform the assessment.

Even assuming that Taylor was inadequately trained, the Plaintiffs cannot satisfy the second element of the analysis: that the inadequate training was a result of Bluegrass' deliberate indifference. To establish deliberate indifference, the plaintiff must show an affirmative decision

by the defendant to follow a course of action that will result in harm to the persons affected by the policy. *City of Canton*, 489 U.S. at 390-91. In other words, "only where a failure to train reflects a 'deliberate' or 'conscious' choice by an entity to pursue inadequate training policies can the company be liable for failure to train under § 1983.

Nothing in the record establishes any "deliberate" or "conscious choice" by Bluegrass to cause inadequate training policies. The record contains no policy, practice, or custom of Bluegrass which indicates any lack of training on the part of Bluegrass. As explained above, Taylor received on-the-job training as well as training and education he completed in conjunction with his social work training and licensure. Moreover, the training process for Bluegrass employees at the Detention Center as outlined by the testimony and Manual cannot be said to amount to deliberate indifference. The record reflects that Taylor was trained on providing risk assessments and that Pridemore did indeed receive a risk assessment on two separate occasions. Nothing in the record establishes any deliberate indifference on the part of Bluegrass. At most, Taylor was negligent, but this alleged negligence cannot be the basis for imposing liability or causation for failure to train under § 1983 on the part of Bluegrass.

Because the Court finds that the Plaintiffs have failed to establish that Taylor's training was inadequate or that this inadequacy was the result of Bluegrass' deliberate indifference, the Plaintiffs are unable to establish that the Defendants' actions were the "prime moving force" causing Pridemore's death. Accordingly, the Defendants' motion for summary judgment on the Plaintiffs § 1983 claim for failure to train will be granted.

C. **STATE LAW CLAIMS**

The Plaintiffs' remaining claims are based on Kentucky law. The supplemental jurisdiction statute, 28 U.S.C. § 1367, explicitly allows a trial court to dismiss pendent state law claims where all federal claims have been dismissed. Moreover, this Court has engaged in a consideration of "the interests against needlessly deciding state law issues" and concludes that the dismissal of the Plaintiffs' state law claims is warranted. *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1182 (6th Cir. 1993). Finally, the Sixth Circuit Court of Appeals has held that as a general matter where the federal claims are dismissed before trial, pendent state law claims should be dismissed as well. *Id*. Accordingly, the Plaintiffs' state law claims will be dismissed without prejudice.

IV. **CONCLUSION**

For the reasons set forth above, the Court, being fully and sufficiently advised, hereby **ORDERS** as follows:

(1) the Plaintiffs' motion for oral argument [DE #100] is **DENIED**;

(2) the Defendants' motions to dismiss [DE ## 78 and 96] are **GRANTED**, and summary judgment in favor of the defendants on the Plaintiffs' federal claims will be entered contemporaneously with this Opinion & Order;

(3) the Plaintiffs' remaining state law claims are **DISMISSED WITHOUT PREJUDICE**; and

(4) the Plaintiff's motion to exclude testimony [DE # 86] is **DENIED** as moot.

This December 21, 2012.



Signed By:

*Karl S. Forester* KSF

**United States Senior Judge**